# UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

---

| | |
|---|---|
| United States of America, | ) |
| | ) CR-20-mj-03058-MTM-1 |
| Plaintiff, | ) |
| | ) Phoenix, Arizona |
| vs. | ) March 20, 2020 |
| | ) 1:38 P.M. |
| Chauncey Hollingberry, | ) |
| | ) |
| Defendant. | ) |

---

BEFORE:  THE HONORABLE DEBORAH M. FINE, MAGISTRATE JUDGE

TRANSCRIPT OF PROCEEDINGS

DETENTION HEARING

APPEARANCES:

For the Government:
           U.S. Attorney's Office
           By: LISA E. JENNIS, ESQ.
           40 North Central Avenue, Suite 1800
           Phoenix, AZ  85004

For the Defendant Chauncey Hollingberry:
           Federal Public Defender's Office
           By: ZACHARY D. CAIN, ESQ.
           850 West Adams Street, Suite 201
           Phoenix, AZ  85007


Transcriptionist:
Barbara H. Stockford
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc. 39
Phoenix, Arizona  85003-2151
(602) 322-7247

Proceedings Recorded by Electronic Sound Recording
Transcript Produced by Transcriptionist

1              INDEX OF EXHIBITS

2     NO.      DESCRIPTION                              RECEIVED

3     1        Six victim letters                          5

4     2        Reimer injunction                           5

5     3        Cook injunction                             5

6     4        Victim K injunction                         5

7     5        Emails from defendant                       5

8     6        Mask                                        5

9     7        Sign found in defendant's closet on March   5
10             13th, 2020

11    8        Photograph of defendant's mother's          5
               bedroom

12    9        Photograph of defendant's bedroom           5

13    10       Two YouTube videos from defendant's         5
14             channel, Law Offices of Daddy & Master,
               dated January 19th and January 20th, 2020

15

16

17

18

19

20

21

22

23

24

25

1        THE COURTROOM DEPUTY:  This is Case No. 2020-3058-MJ,

2   United States of America versus Chauncey Hollingberry.  This is

3   the time set for a detention and a preliminary hearing.

4        MS. JENNIS:  Good afternoon, Your Honor.  Lisa Jennis

5   for the United States, and I'm here with the FBI Special Agent

6   Jason Saitta.

7        THE COURT:  Good afternoon to you both.

8        MR. CAIN:  And good afternoon, Your Honor.  Zach Cain

9   on behalf of Mr. Hollingberry who is seated in the jury box.

10       THE COURT:  Good afternoon to you both.

11       This is the time of both the preliminary hearing and

12   the detention hearing.  The government has provided a

13   memorandum.  I appreciate the courtesy email to opposing

14   counsel and to me, and I also reviewed the six victim letters

15   that were provided by the government.  And so, at this time,

16   Ms. Jennis, you may call your first witness or you could

17   proceed by proffer.

18       Mr. Cain?

19       MR. CAIN:  Thank you, Your Honor.  Your Honor, we

20   have -- the parties had an opportunity to confer before the

21   hearing about the issue of the preliminary hearing.  I've had

22   an opportunity to meet with Mr. Hollingberry this morning and

23   to review more of the government's information.  We're prepared

24   to waive the preliminary hearing at this point.

25       THE COURT:  Okay, thank you.  I thought from the book

1    of exhibits, while you're welcome to have that for the

2    detention hearing, too, I thought that was a sure-fire sign the

3    preliminary hearing was going.

4              Sir, you have the right to an early hearing, an

5    evidentiary hearing, for the Court to decide whether there's

6    enough evidence for the case to proceed further.  Whether

7    there's probable cause is the legal standard.  Your attorney

8    has stated that you wish to give up that hearing.  The

9    consequence of such is that I will find there's probable cause

10   for the complaint to proceed.  You'll be ordered to answer for

11   further court proceedings thereon.  Do you understand?

12             THE DEFENDANT:  Yes.

13             THE COURT:  And is that what you wish to do; waive,

14   give up, your preliminary hearing?

15             THE DEFENDANT:  Yes.

16             THE COURT:  Thank you.

17             I find the defendant's waiver is knowing, voluntary,

18   intelligent based on the waiver and the information in the

19   complaint and accompanying affidavit.  I find there is probable

20   cause for the complaint to proceed and, sir, you're ordered to

21   answer for further proceedings thereon.

22             So now we're just -- has there been -- now we're

23   dealing with detention.  Has there been an agreement on the

24   issue of detention or are we proceeding?

25             MS. JENNIS:  We are proceeding on detention, Your

1    Honor, and I would like -- the United States would like to

2    proceed by proffer.

3           We have -- I have shared the 10 exhibits with defense

4    counsel.  That's what's in front of Your Honor.  Those are all

5    for the detention hearing.  And defense counsel has informed me

6    he has no objection to any of these exhibits.  So, therefore,

7    I would like to move all 10 exhibits into evidence.

8           THE COURT:  And Mr. Cain; is that correct?  No

9    objection?

10          MR. CAIN:  Yes, Your Honor.

11          THE COURT:  Thank you.  So I am admitting into

12   evidence the Exhibit 1, the six victim letters; Exhibit 2, the

13   Reimer injunction; Exhibit 3, the Cook injunction; Exhibit 4,

14   the Victim K injunction; Exhibit 5, emails from defendant;

15   Exhibit 6, mask; Exhibit 7, sign found in defendant's closet on

16   March 13th, 2020; Exhibit 8, photograph of defendant's mother's

17   bedroom; Exhibit 9, photograph of defendant's bedroom; and

18   Exhibit 10, two YouTube videos from defendant's channel, Law

19   Offices of Daddy & Master, dated January 19th and January 20th,

20   2020.

21          (Exhibit Nos. 1 through 10, inclusive, admitted into

22   evidence.)

23          THE COURT:  At the end of the hearing, the original

24   exhibits will be returned to the offering party and you are

25   ordered to retain those exhibits for the remainder of the case

1    including through any mandate that issues.  That's our

2    practice, and so I'm putting it on the record so we're all

3    clear in all of my cases.

4          So, Ms. Jennis, it's your choice.  Would you like me

5    to review the exhibits now or would you like to proffer first

6    or have me review them during your proffer?  How would you like

7    me to do that?

8          MS. JENNIS:  I would like to talk about each of them a

9    little bit, Your Honor.

10          THE COURT:  That works very well.

11          MS. JENNIS:  And I'd like to start with that.

12          THE COURT:  Thank you.

13          MS. JENNIS:  Is it okay if I stand here as opposed

14    to --

15          THE COURT:  Yes.

16          MS. JENNIS:  Thank you.

17          So the first exhibit which both you and defense

18    counsel were provided were the six victim letters.  Much of

19    their personal information was redacted, but for Your Honor's

20    understanding, the first one is from Victim K.  And when we say

21    "Victim K," that is the same Victim K that is referred to in

22    the complaint.

23          THE COURT:  Thank you.

24          MS. JENNIS:  And then the next letter of Exhibit 1,

25    March 18th, is Victim K's -- is written by Victim K's mother.

1    The next letter is written by the defendant's uncle who is also

2    related to Exhibit No. 3, the Cook injunction.

3         Exhibit -- or letters -- I apologize -- letters --

4    Letter 4 I think we're on now, March 19th, is related to

5    Exhibit No. 2 which is the Reimer injunction.  And the

6    remaining two letters do not have -- there are people who have

7    been victimized by the defendant, but there are not injunctions

8    related to them.  Those last two people work at an elementary

9    school in the Cave Creek district.

10        That is just for Your Honor's information.

11        THE COURT:  Thank you.

12        MS. JENNIS:  The next three exhibits, so 2, 3 and 4,

13   are injunctions all issued here in Maricopa County.  I will

14   point out that Mr. Cook, which is Exhibit No. 3, the

15   defendant's uncle, lives in California, but did obtain an

16   injunction in Maricopa County.  And they've all been properly

17   served and they're all less than a year old.  So they are all

18   active.  In fact, some of them are pretty recent.  I would say

19   the oldest one I put first is Exhibit No. 2, that was -- it was

20   issued in April of 2000 -- April 23rd, 2019; served on May 3rd,

21   2019 -- or May -- I'm sorry.  It was served on May 2nd, but

22   filed on May 3rd.  And the next one, Exhibit 3 for the

23   defendant's uncle, was filed on December 3rd, 2019, and served

24   in -- a little hard to see, but it looks like January -- I'm

25   trying to see.  So it looks like it was served -- oh,

1    December 17th, 2019.  And when that one was served, Your Honor,

2    it was served in California because the defendant had come on

3    to the uncle's property and they served him at that location.

4    I just wanted to point that out.  It's not the best copy.  It's

5    the best copy that I had, but if you look about a third of the

6    way down, it tells you where the service was and you can see it

7    was in California.

8         Exhibit 4, which I took the name out as one of the

9    people -- it's an injunction against workplace harassment

10   because Victim K is an employee of the Arizona Attorney

11   General's Office and it mostly covers her, but it also covers

12   the Arizona Attorney General himself, and so there are

13   specifics in there.  And I took out the defendant's personal

14   information also.  But, in there, it's way at the bottom, it

15   says that, in a January 20, 2020, video entitled "Arizona

16   Attorney General's Office," the defendant stated he had Level V

17   body armor and was going to the gun range and so, therefore, he

18   cannot have any weapons or ammunition, and he didn't when we

19   executed the search warrant at his residence on February --

20   sorry -- March 13th.  He did not have any of that -- any

21   firearms or anything like that, but he certainly has talked

22   about them.

23        You probably saw in the detention memo and also in the

24   complaint that he has mentioned several times about his body

25   armor and going to a gun range along with a kind of poll that

1    he took of his viewers to see if he should bring a gun to a

2    synagogue.

3            In Exhibit No. 5, these are three emails, Your Honor,

4    and it goes in reverse chronological order and it's actually

5    related to Exhibit No. 10.  In Exhibit No. 10, there are videos

6    that the defendant posts on his YouTube channel and he says,

7    "I'm going to the" -- you'll hear it in a second, but he says,

8    "I'm going to the Attorney General's Office and I'm going

9    to" -- or "I'm going to send them emails," and these are the

10   emails that he's talking about.

11           So the first one is sent Sunday, January 19th.  It's

12   Page 3 of the exhibit.  It's sent around 9:00 that night and

13   it's directed to the victim.  And he said, "By allegedly

14   placing privacy complaints on public records, you're in

15   violation of the law.  I'm going to send you a notice of claim

16   and the lawsuit at the appropriate time.  Please stop violating

17   my First Amendment rights.  You will not silence me.  The

18   entire AG's office has been signed up for the First Amendment

19   newsletter.  Thank you for creating a record."

20           You can see it doesn't have -- it's signed "Chauncey

21   Hollingberry, Paralegal."  My understanding is that he's in

22   school at Phoenix College.  When the agents asked him if he's a

23   paralegal, he says, "Well, the definition of a paralegal is

24   that you work under the guidance of an attorney."  And I think

25   his homework was what he meant, that he prepares legal papers

1    under the guidance of his professors.

2         Soon thereafter, he sends another -- and you can

3    see -- I just wanted to point out all the people he has sent

4    this email to.  Most of them appear -- including the Attorney

5    General himself, most of the people work for the Arizona

6    Attorney General's office on this one, but he adds additional

7    people to the next email which was sent about two hours later,

8    and he says to the victim, "Let's invite everyone in the

9    Arizona government to this party.  Let's see.  We have the AG

10   on here, the Court and the news."  And I think, by that, he

11   sent it to News12.com.

12        "For everyone at home, rogue employees at the Attorney

13   General's Office use their official position allegedly to stop

14   the publication of public records and the AG's office refuses

15   to take the criminal complaint.  How crazy do" -- and it lists

16   Victim K -- "and her buddies want this to get?"

17        And so he attaches to this email -- oh, I'm sorry.

18   It's the next email that he has an attachment.  Sorry.  The

19   email prior -- the email he sends subsequent to that is

20   January 20, 2020, at 6:30 a.m.  It appears to include the same

21   people plus the news and its subject is "Victim K's drug

22   arrest" and includes a mug shot as an attempt -- and it's

23   actually a mug shot, Your Honor, of the victim -- saying "You

24   lost in court."  I can only guess at what that means, but he

25   was cited for trespassing.  I think it's in the Pretrial

1    Services report --

2          THE COURT:  Um-hmm.

3          MS. JENNIS:  -- and that got dismissed.  It never

4    actually went anywhere.  And I'm just going to highlight it

5    instead of reading the whole thing because you can, of course,

6    read it.  He says he's running Facebook ads "...with your mug

7    shot for drug possession all over Facebook amongst other AG

8    videos.  Smile, you are famous online.  I will resist you every

9    step of the way.  Do not take away my constitutional rights.

10   Please seek help for your drug addiction.  It's clouding your

11   judgment."

12         And then the last one is titled victim's name and

13   "nude photos."  Also sent to the U.S. -- to the assistant --

14   sorry -- to the Arizona Attorney General and also the news, and

15   he talks about nude photos of the victim and he says they can

16   be found online.  I believe the screen name is the G Princess.

17   So I just wanted to go over that.

18         Exhibit 6.  This is what you -- this mask was found in

19   his car.  And I do apologize for not the greatest photo, but

20   this is a mask that is called an Anonymous mask, and what the

21   Anonymous group does is they hack into other people's emails --

22         AGENT SAITTA:  They hack and release.

23         MS. JENNIS:  They hack and release private

24   information.

25         And in my detention memo, I talk about the defendant

going to a synagogue and pretending not to speak any English.
That is -- he was wearing that mask at the time that he did
that.  I just wanted -- I had neglected to say that in the
detention memorandum.  So I wanted you to see that.

Exhibit No. 7 is a sign that was in defendant's
closet.  It says "fuck the police."  I think this goes to his
pattern of not listening to authority.

Your Honor, that's pretty much just part of what he
does is he harasses police, private figures, synagogues,
churches, schools, and other -- other people -- his uncle,
things like that, and he's -- he's been doing this constantly
for the last couple years.

THE COURT:  And just so we are clear because I don't
know that I'll wind up going through each and every piece of
these things and it may shorten some of what Mr. Cain is going
to say, I appreciate all the exhibits and the admitted
Exhibit No. 7, but, to me, what's in Exhibit No. 7 is an
exercise of First Amendment rights that's protected under clear
Supreme Court precedent, the sign alone.  How the sign may be
used and other things surrounding it, but the sign being in his
closet, you know, I -- so for me, that -- that actually carries
no weight.

MS. JENNIS:  Thank you, Your Honor, for letting me
know that, and I was really doing -- demonstrating that because
it's the government's position that any rules the Court would

UNITED STATES DISTRICT COURT

1    impose the defendant, like he has done in the past, would

2    ignore.

3              THE COURT:  Yes, and it's good advocacy.

4              MS. JENNIS:  Right.

5              THE COURT:  But I'm just -- I'm just trying to cut

6    through things for later.

7              MS. JENNIS:  And Exhibit No. 8.  So the defendant

8    lives with his mom who, I believe, is here in the back of the

9    courtroom.

10             THE COURT:  Thank you for coming, ma'am.

11             UNIDENTIFIED SPEAKER:  Yes.

12             MS. JENNIS:  And he lives with her in a two-bedroom

13   apartment.  He has the master and she lives in the other

14   bedroom.  And I wanted to include this picture because, as

15   I believe I stated in my memorandum, she sleeps on a bean bag,

16   Your Honor, and she told the agents that she hasn't been --

17   hasn't left the house since the entire time that she has lived

18   there.  Now, she says she likes to bike and hike, and she's got

19   a bike and a treadmill in there.  And this concerned us.  It

20   just concerned us.  And when the defendant was arrested, he had

21   two credit cards in her name on his person along with her debit

22   card.  He told the agents he did not have a power of attorney,

23   but he does, and you'll have a copy of it, and he has for a

24   while.  And reason we know so much personal information is

25   because his -- his family has a trust --

1    THE COURT:  So he told the agents he does not have the

2  power of attorney?

3    MS. JENNIS:  Yes.

4    THE COURT:  But, in fact, he does have the power of

5  attorney?

6    MS. JENNIS:  Yes, and I do have a copy with me if your

7  Honor is interested in seeing it.  He has had it --

8    THE COURT:  2013, I think.

9    MS. JENNIS:  Yes.  So he does have that for his mom

10  who is here today.  And she -- and she said, you know, she

11  doesn't have access to any finances.  He has access to

12  everything.  And so I wanted to explain why I had that photo

13  because I thought it was strange that a 59-year-old woman was

14  sleeping on a bean bag in her son's apartment.  And it's not

15  that there aren't beds in the apartment because, if you go to

16  Exhibit No. 9, there's a bed.  And this is the master bedroom

17  to which there is a bathroom attached, and I just wanted to

18  point out that there's the bed and the defendant's computer set

19  up.

20    And then lastly is Exhibit No. 10.  In the -- I know

21  that, Your Honor, we do have some time, but I don't want to

22  take up too much time because I want to leave that for

23  Mr. Cain, but I do have two videos that -- I don't think we can

24  play the video, but I'd like to play the audio.

25    THE COURTROOM DEPUTY:  Your Honor, because we need the

1  cart brought in, I wasn't given forewarning that we need that

2  cart.

3          MS. JENNIS:  That's my fault.  I did not.

4          THE COURT:  I'm sorry.  We changed the whole set-up

5  for that and now you have to reserve it at least a day in

6  advance.  Longer is better.  But it used to be you could just

7  plug it in and I don't know that we've made that well known.

8  Now you do -- now you know.  And it's not a waste of my time to

9  hear the audio.  I'd like to hear the audio.

10         MS. JENNIS:  Yes, and so may I sit down?

11         THE COURT:  Yes, absolutely.

12         MS. JENNIS:  So, to explain to Your Honor the audio,

13 there's two -- well, the videos came from defendant's YouTube

14 channel which is called the "Law Offices of Daddy & Master."  He

15 is not a lawyer.  Occasionally he holds himself out as someone

16 who has attended law school.  I don't have information that

17 that's accurate.  But I do have these videos.  And why these

18 videos are important, as I stated earlier, is they go with

19 those emails.  They occurred right around the same time.

20         So the first one is No. 10.  Oh, sorry.  It's part of

21 Exhibit No. 10.

22         (Audio recording played as follows:)

23              "[Indiscernible] is a rough morning

24              for Cassandra.  So basically the email

25              address, if you want to know anyone's

UNITED STATES DISTRICT COURT

1     "email address here at the government in
2     Arizona, if you know their first and last
3     name, which is online, you usually put a
4     period in between the first and last name
5     and put "@" and whatever domain they're
6     associated with.  So for the Attorney
7     General's Office, it's azag.gov.  It's
8     real easy.  It's not a code or anything.
9     So I went ahead and I sent an email to
10    about a hundred people in the government
11    including people in the court, through the
12    news stations as well.  I sent everyone
13    Cassandra's drug mug shot.  And allegedly
14    I told everyone -- [indiscernible] an
15    email about nude photos.  That's for real.
16    And just every -- just totally plastered
17    her and everyone else with emails.  And
18    then [indiscernible] -- he wouldn't assist
19    me with my complaint.  So I went ahead and
20    [indiscernible] a claim on Cassandra.  So
21    Cassandra is having a rough morning.  She
22    needs some marijuana.  So if anyone wants
23    to mail her some.  Like I definitely
24    encourage everyone to mail Christina some
25    marijuana and send it to her work address

1      "and -- the AG's office.  And then, yeah.

2      So basically what's going on.  And I don't

3      care how much money or how much time it

4      takes.  I'm taking that bitch down.  And

5      whoever else is doing these privacy

6      complaints, I will own them in court.

7      I will own her.  So that's basically it.

8          And then I knew there was something

9      else I was going to state, but -- I don't

10     know.  I just really forget.  So, yeah,

11     that's all I wanted to say.  Cassandra is

12     having a rough morning and that's all

13     I want to say."

14     MS. JENNIS:  Your Honor, just so you understand --

15     this is on the video -- this occurred on January 19th, 2020.

16     And he has a following on YouTube, this channel, of close to

17     3,000 followers.  And one of them I know was a live feed and

18     then the next one you'll see -- oh, I mean, I'm sorry -- you'll

19     hear that he is talking to his followers as it's playing.  It's

20     their posting.

21         (Audio recording played as follows:)

22         "Okay.  So I'm just -- I'm not going

23     to wait for anyone to get here.  So --

24     sorry about the bad lighting.  But the

25     Attorney General's office is up to their

UNITED STATES DISTRICT COURT

1    "old bag of tricks again.  They are

2    absolutely plastering my channel with

3    complaints.  So Cassandra -- sorry.  Her

4    name right now, it's 'Cassandra,' not

5    'Christina.' So Cassandra [indiscernible].

6    So Cassandra at the Attorney's General's

7    office is continuously putting privacy

8    complaints.  So what's been going on is,

9    when you see videos disappear and then

10   suddenly a video gets uploaded again and

11   it looks really similar, it's because they

12   keep -- [indiscernible] -- so I take the

13   video down and make adjustments and then

14   I re-upload it again.

15        Hi, everyone.

16        So they just did

17   another [indiscernible] complaint and

18   they're not doing it normally.  I got a

19   whole -- I got an email of a list of

20   videos.  I got -- her mug shot and all

21   this BS.  [Indiscernible] You may be busy

22   in February, though.  It depends.  But,

23   so, basically, they did a whole list of

24   cross-complaints.  So now I have to take

25   the videos down and re-upload them again

1    "which is fine.  It takes me like -- it

2    takes me like 10 to 15 minutes of my time.

3    It really doesn't matter.  But what I want

4    everyone to know is I have all the email

5    addresses to everyone at the Attorney

6    General's office that works there.  So I'm

7    going to start email bombing them and I'm

8    going to get a spreadsheet and I'm going

9    to post it on my channel of all the email

10   addresses of everyone at the AG's office

11   including Cassandra, and I'm going to be

12   sending everyone in the office her mug

13   shot and I might even be sending some nude

14   photos.  Allegedly someone sent me some

15   nude photos of her, of -- yeah.  So I'm

16   going to be email bombing the AG's office

17   daily until it stops.  And I'm creating my

18   own domain.  I'm creating my own domain

19   and I will tell everyone the website when

20   I'm ready.  So when I release these email

21   addresses, I want -- and I don't even care

22   that I'm saying this because I will go to

23   court on this and I'll win it.  I want

24   everyone to start emailing the AG's

25   office.  Start email bombing them, sending

1         "massive emails saying 'fuck you,' just

2         profanity.  I'm not telling anyone to make

3         any threats, but if you want to make

4         threats, I mean, that's your choice.  But

5         just absolutely bomb that office with

6         emails until they stop doing it.

7             Arizona [indiscernible] okay, yeah,

8         just go ahead.  Anyone who needs to email

9         me, I will go ahead -- okay, so my email

10        is a real long email, but I'll go ahead

11        and I'll put it in the description of this

12        email.  And also on my channel, I think,

13        on the back of my channel.  Right for now,

14        you can just email to

15        chaunceycook29@gmail.com.  That's

16        two-nine.  So chaunceycook29@gmail.com.

17        That's a forwarding account.  So it gets

18        somewhere else.

19             But -- yeah, so I'm sad.  I want

20        everyone to start bombing this office with

21        emails.  Oh, and I'm going to release

22        everyone's phone number.  I have all the

23        phone numbers and email addresses of

24        everyone who works in the back office

25        there at the AG's.  I'm going to create a

1    "spreadsheet.  I'm going to upload it and

2    just fuck with these people because that's

3    what I'm going to be doing.  I'm going to

4    be fucking with them all the time.

5         So, I swear to God, I'm going to send

6    nude photos to everyone at the AG's office

7    of -- someone sent me nude photos of

8    Cassandra and her mug shot.  So I'm going

9    to send nude photos -- I swear to God.

10   Seriously, I'm going to up- -- I'm going

11   to post proof that I'm doing this to a

12   video and I'll attach it to my drive so

13   people can see it.  Nude photos and her

14   meth shot, whatever, that mug shot, and

15   that's what's going to be happening.  So

16   I just want to keep everyone updated.  So

17   don't -- don't -- like if you keep

18   seeing -- if you keep seeing videos being

19   uploaded, don't, like, hate on bitches.

20   Understand that they keep doing privacy

21   complaints.  So I keep taking them down

22   and re-uploading again.  So that's all

23   I want to let everyone know.  If they take

24   my channel down, just go to my Facebook,

25   which I think I've told everyone what my

1           "Facebook is, and then you'll find my new

2           channel.  So just everyone get ready for

3           that because Cassandra is going to be in

4           for a world of hurt and there's going to

5           be some -- yeah, there's going to be nude,

6           naked photos, I swear to God, naked photos

7           and her mug shot are going to be sent to

8           everyone.  Everyone at the Attorney

9           General's Office tomorrow is going to get

10           an email of a fucking nude -- a nude

11           woman.  I can't even -- it's too much.  So

12           I just -- I just want to let everyone

13           know, yeah, who is now -- yeah.  So nude

14           photos and mug shots.  So that's happening

15           tomorrow.  Everyone is going to get a real

16           fucking eye-opener of Cassandra.  So I'm

17           going to go ahead and sign off now because

18           I have to run in the gym, but I just want

19           to let everyone know that the fuckery --

20           the fuckery is about to begin.  That's all

21           I have to say."

22       MS. JENNIS:  Your Honor, I was mistaken before that

23 that occurred on January 20th.  That's a January 19th live

24 posting.  And what happens is people who are watching it, they

25 can post stuff and then he'll answer.  So sometimes he was

1    saying what their name was and answering them.

2            Just to wrap things up, Your Honor, the defendant used

3    the internet as a weapon of terror.  He engaged in a campaign

4    of harassment and intimidation against Victim K and others.

5    It's the government's position -- not that the Court has to

6    find this -- that this is a serious crime of violence that

7    involved conduct that intended to harass, embarrass and cause

8    emotional distress to a private individual.  He quickly spread

9    this personal and private information about Victim K on

10   YouTube.  As you heard him talk about Facebook, he also had a

11   website, and he had emails to her coworkers that you've seen.

12           The victim has had to have security guards escort her

13   back and forth to work.  She has suffered severe emotional

14   distress as we see by her letter and the letter of others.  I'm

15   sure, as you review the letters, you could see how the

16   defendant's actions have permanently changed the private

17   individuals, their lives.  Your Honor, the weight of the

18   evidence is strong.  Everything was on video, email, voicemails

19   and the communications that you've just heard.  Things speak

20   for themselves.

21           When he was interviewed, he admitted his conduct.  He

22   just didn't think there was anything wrong with it.  He says he

23   can't control other people's feelings and they can't limit his

24   freedom.  He has flaunted court's orders during his course of

25   campaign against Victim K.  Even when he was served with a

1    court order -- and this is his uncle that restrained him from

2    any acts of harassment -- he continued to harass his uncle.

3    Sometimes in the videos, there's both uncle harassment and the

4    Victim K harassment.

5            THE COURT:  And, Ms. Jennis, we do need to leave

6    Mr. Cain sufficient time.  I'm sorry to interrupt you.

7            MS. JENNIS:  That's it, Your Honor, then.  Thank you.

8    You know that the United States thinks there is no combination

9    of conditions that would keep everyone safe.

10            THE COURT:  And just to make sure, this is not a

11    presumption case, correct?

12            MS. JENNIS:  It is not, Your Honor.

13            THE COURT:  Thank you.

14            Mr. Cain, is there any evidence, proffer or argument

15    you wish to present on the issue of detention?

16            MR. CAIN:  Your Honor, we just intend to make

17    argument.  It is our position, Your Honor, that there is a

18    combination of conditions that the Court can impose to both

19    ensure that Mr. Hollingberry appears for court proceedings, but

20    also addresses any concerns the Court has for the safety of any

21    witnesses or the community.

22            In hearing the presentation from the government and

23    the words that were spoken, obviously, those provoke very raw

24    emotions in response, and it is certainly understandable that

25    the alleged victims in this case have those feelings.  The only

1  thing that I could say to put this case in parity with other

2  cases that this court must decide detention issues is that,

3  even in hands-on cases where a person has allegedly committed

4  an act of violence against another individual, there are still

5  times when the Court can fashion conditions to address both

6  concerns about flight as well as risk to the community.

7         Pretrial Services has proposed conditions to

8  Mr. Hollingberry.  He is willing to abide by those conditions.

9  The Court could address any concern about Mr. Hollingberry

10 having contact with any alleged victims in this case by not

11 permitting him to have access to a computer, not permitting him

12 to upload or post any content to a YouTube channel, by

13 restricting his communication with anyone who is identified as

14 a follower on his YouTube channel.

15        The government has suggested to the Court that

16 Mr. Hollingberry has violated these prior orders, but we don't

17 have evidence of that in the form of actual arrest for

18 violation of those orders for, in superior court speak,

19 interfering with judicial proceedings, arrests or prosecutions.

20        I think having a better understanding of the

21 government's evidence at this point and me having the

22 opportunity to confer with Mr. Hollingberry about the

23 importance of abiding by any order this Court imposes, he has

24 expressed a willingness to follow those orders and a

25 willingness to follow the Court's directive that he not have

1    any contact or encourage anyone else to have contact with any

2    alleged victim.

3          He does have longtime ties to the community.  He does

4    have a home where he lives with his mother.  His mother is here

5    in support of him.  He does currently have a job.  At least he

6    did at the time of his arrest a few days ago.  He works at

7    Home Depot.  He believes that job will remain available to him

8    if he is released quickly.  So it's our request, Your Honor,

9    that the Court release him with conditions.  And we have

10   nothing further.

11         THE COURT:  Thank you.  Anything further from the

12   government?

13         MS. JENNIS:  Yes, Your Honor.  It is the United

14   States' understanding that he is no longer employed.  I gave

15   that information and a contact phone number to Pretrial, just

16   for an arrest for a felony.  Now he was arrested for aggravated

17   assault.  My understanding is also that that was dismissed, but

18   that does show his escalation to violence.

19         I think that this is different than a physical

20   violence case.  This is a case where, in the electronic world,

21   you can just terrorize people with your phone.  And I think

22   it's clear that -- that the defendant here has done that in the

23   last couple years to a lot of people, but especially lately, as

24   charged in the complaint, to Victim K.  And -- and, Your Honor,

25   we've already explained why we don't think it's appropriate

1    that he live with his mother.

2            That's all.  Thank you.

3            THE COURT:  Thank you.

4            The defendant is entitled to the presumption of

5    innocence at all times.  The question under the Bail Reform Act

6    is whether, notwithstanding the presumption of innocence, the

7    defendant should be released or detained pending trial.  This

8    is not a presumption case.  There is a question before the

9    Court of whether this is considered a crime of violence.  The

10   government detailed that in its memorandum and I agree with its

11   analysis about how you determine whether something's a crime of

12   violence here.

13           So if it's a crime of violence or not, if the

14   government has shown by a preponderance of the evidence that

15   the defendant's a flight risk in a case that's a crime of

16   violence or, by clear and convincing evidence, that the

17   defendant is a danger, then the next step is for the Court to

18   go to whether there are conditions that I can set that would

19   reasonably assure appearance and reasonably assure safety.  The

20   Bail Reform Act also allows the Court to consider whether,

21   under 18-3142(f)(2)(B), whether there's a serious risk that the

22   person will obstruct or attempt to obstruct justice or

23   threaten, injure, intimidate or attempt to threaten, injure or

24   intimidate a prospective witness or juror.  And it seems to me

25   that the government's position is, if I understood it right,

1   that this is a crime of violence under the Bail Reform Act and,

2   therefore, I can consider danger.  And the government is

3   requesting detention under danger and that subsection regarding

4   obstruction or attempt to obstruct justice, but not on

5   nonappearance.  Am I correct?

6            MS. JENNIS:  I did at the end make an argument for

7   appearance, Your Honor, and that had to do with the fact that

8   he has not listened to orders prior.

9            THE COURT:  Okay.

10           MS. JENNIS:  And also he is not employed and his

11  living situation.

12           THE COURT:  Okay, thank you.

13           And so I do find that it's appropriate for me to

14  consider whether there's clear and convincing evidence that the

15  defendant is a danger.  I am considering this a case based on

16  the nature of the -- based on the charge itself, and when you

17  look at the circumstances -- and I realize that the categorical

18  approach is advocated by the government, but if you also look

19  at the circumstances, this involves really a clear ambient

20  threat of violence to the victim, what he's accused of doing.

21           If I find that, by a preponderance of the evidence,

22  he's a flight risk, by clear and convincing evidence that he's

23  a danger, or I'll call -- I'm not sure the standard, but I'll

24  go to clear and convincing in this case -- clear and convincing

25  evidence that the person -- that there's a serious risk that

1    the person will obstruct or attempt to obstruct justice,

2    threaten or injure or intimidate, attempt to threaten or injure

3    or intimidate a prospective witness or juror -- I think it's

4    probably preponderance, but that's of no matter in these

5    circumstances.  When I consider the factors under the Bail

6    Reform Act including the nature and the circumstances of the

7    offense, the weight of the evidence against the defendant, that

8    second factor has the least weight in my consideration.  The

9    nature and seriousness of the danger to others or the community

10   and the history and characteristics of the defendant, including

11   the defendant's physical and mental condition, family ties,

12   employment, length of residence in the community, community

13   ties, past conduct, criminal record, history of drug or alcohol

14   abuse, record of appearance at prior court proceedings and

15   whether the defendant was on conditional release of some sort

16   at the time of the new alleged offense -- I've considered

17   everything that's been presented in the courtroom and the other

18   things that I reference that I read including the Pretrial

19   Services report and the addendum.  While I appreciate the

20   Pretrial Services' perspective and recommendation and I adopt

21   the information in the Pretrial Services report and addendum,

22   I don't agree with its recommendations.  For making my findings

23   and doing this efficiently, it's just easier for me in this

24   particular circumstance to talk about the things that the

25   government has presented either in the memo or in the exhibits

1   or argument that I am not finding persuasive, but I'm going to

2   make -- I am making findings that, by a preponderance of the

3   evidence, the defendant is a risk of nonappearance.  That

4   showing has been made based on the evidence here.  But, for

5   that, I find that there are conditions that I could set that

6   would reasonably assure his appearance at further court

7   proceedings.  But I also find by clear and convincing evidence

8   that he is a danger and I find by clear and convincing

9   evidence, although it's probably preponderance, that there's a

10  serious risk that -- that the defendant will obstruct or

11  attempt to obstruct justice, threaten, injure or intimidate or

12  attempt to threaten, injure or intimidate a prospective witness

13  or even a prospective juror in the case, but here particularly

14  Victim K.  And what I found to be not persuasive, as I look

15  through things, is what I've already stated about the sign.

16  I understand the argument.  I just -- we live in a -- in a

17  society where there's vigorous free speech rights.  And I don't

18  hold those things against -- the defendant's speech can be

19  constitutionally protected, but offensive and may be disturbing

20  and, as Mr. Cain said, could be upsetting to people.  The

21  question is -- under the Constitution is when you've gone over

22  that and you've really -- you've -- they are fighting words.

23  They are threatening by the context, content and actions around

24  it.

25          Also Exhibit 8.  I understand the government's

1   argument and I really don't know what's going on there.  But,

2   you know, for purposes of making my findings here, I don't have

3   to find that there's anything nefarious about the defendant's

4   relationship with his mother or her living situation.  That

5   bean bag looks extremely comfortable, and a lot of people live

6   in a very minimalist way where they use things in multipurpose

7   ways, and it -- certainly, she's here.  She seems to be willing

8   to participate in assisting him with his release.  And so, for

9   purposes of making my findings, I am not considering, although

10  there might be -- I'm not ruling it out, but it's not what's

11  motivating my findings here that there's anything -- any

12  problem in the way the defendant interacts with or treats his

13  mother either financially or otherwise.  And so, really, what

14  this is about is his treatment of Victim K which is consistent

15  with his treatment of other people.

16          We -- I see what Mr. Cain is saying; that sometimes

17  people are released when they're accused of having committed

18  very serious acts of violence.  They tend to be situations that

19  those are done by the -- it's done.  It's finished.  There

20  might be some threats or problems between families or those

21  people, but it's easy also to make really clear physical and

22  other demarcations of contact particularly given that those are

23  generally direct situations.  Here, as Ms. Jennis has

24  articulated, the defendant has weaponized the internet here and

25  he has done a combination of internet and then live and

1    in-person things.  He has created a strong, clear, ambient

2    violence to surround Victim K in every aspect of her life.  For

3    example, when he tells his 3,000 or so followers on the

4    internet to mail marijuana to her at her work address or even

5    at her home address, it's saying "I know where you are.  We

6    know where you are.  You can be reached.  You can be touched

7    and you will be in a harmful way."

8           And our virtual selves alone have become very

9    important.  It's almost impossible to go through our day

10   without accessing our email and our texts and our social media

11   just to even know where maybe an exercise class might be or

12   make a reservation at a restaurant, check a child's grades, do

13   any of that -- those things.  As someone who, as a job, does

14   not have my phone with me and rarely even goes to my computer,

15   I -- when I'm in the courtroom, so I have the pleasure of being

16   away from those things, it pervades.  And that here, bombarding

17   with emails, spreading nude photos or even the threat of that

18   on the internet is -- it is a personal invasion that is akin to

19   the other physical and sexual violence that women in the United

20   States of America experience day in and day out.  It is

21   invoking the threat of violence against women.  The fact that

22   others in his life, as varied as his uncle and others that

23   Ms. Jennis point out, have needed to get orders of protection

24   and he has gone, by their letters, not just to harm them on the

25   internet, to slander, defame and interfere with their personal

1   and business and charitable relationships, that he has showed

2   up at those places, the insidious acts of this, he is -- you

3   know, Mr. Hollingberry is very smart and he has figured out all

4   the different ways to harass someone and make them feel unsafe.

5   And it is valid that Victim K feels unsafe.  She is a competent

6   witness to her own life and her own feelings based on

7   Mr. Hollingsworth's [verbatim] actions here.  He admits these

8   actions.  He sees nothing wrong with them.

9          From the Court's perspective, it's whether or not

10  there's probable cause been established that these kinds of

11  actions -- it's not just wrong; it's illegal.  And it is -- and

12  it is -- so I could go through all the highlights.  I have many

13  tabs on the various things that Ms. Jennis set forth in the

14  memo, but there's been, you know, reference to weapons and --

15  and these things -- he tries to get to the line and sometimes

16  crosses it where he thinks that he can get away with it,

17  appears not physically threatening, but -- but those -- those

18  clever attempts don't escape him.  He doesn't escape from the

19  implications, the message he is sending.  He lied about

20  important things.  He lied about, for example, the power of

21  attorney.  I mean, I don't know why -- maybe that's not

22  material to this, but it's an important familial relation.

23         So for all the reasons really -- and the one other

24  thing I just want to except out, you know, Exhibit 6, that also

25  looks to me a little like from a movie I'm trying to remember.

UNITED STATES DISTRICT COURT

1    I think it was *V for Vendetta*.  And maybe this group that you

2    talked about, Ms. Jennis, has adopted that mask.  I've seen

3    that mask in other context, maybe in Guy Fawkes Day or

4    something as well.  I see people nodding in the courtroom.

5    I probably -- I probably have the first or last name slightly

6    off because I'm really bad with names with that, but I think

7    that there's some British holiday in early November, and so

8    I've seen it associated with that.  So, in and of itself,

9    I really don't think there was very much proffered about it.

10   It's really about the defendant's direct relations to Victim K

11   and marshaling other people to have this direct virtual and

12   real threatening interaction with her.

13          So when I -- I ask, are there conditions that I could

14   set that would reasonably assure?  Yes.  On appearance, he has

15   been well mannered and quiet and appropriate during all of

16   these proceedings.  I think, if I released him, he would show

17   up to court, but I don't think there are conditions that

18   I could set.  There are not conditions that I could set that --

19   and I gave this a lot of thought after reading Ms. Jennis'

20   memo.  There are not conditions that I could set that would

21   reasonably assure the safety of the community and there are not

22   conditions I could set that would reasonably assure the safety

23   of Victim K.  There are not conditions I could set that would

24   reasonably assure that he would not obstruct or attempt to

25   obstruct justice or threaten, injure or intimidate or attempt

1    to do so regarding Victim K and perhaps other witnesses.

2           This tool of marshaling others to do his bidding,

3    saying "I'm not saying that you should do these really -- these

4    illegal things, but that's your choice if you do," and the

5    access to -- he's used phones.  He's showed up in person.  Not

6    just the internet.  Phones.  Those calls where he has been on

7    them, but he could direct other people to do it and other ways

8    he could borrow a phone.  There's just no way.  I've considered

9    whether I could restrict his internet, restrict the phone,

10   electronically monitor him and -- and even home detention

11   rather than a simple curfew.  Even his job -- he doesn't have

12   it anymore, but his experience was in call center things.  It's

13   very hard to go out in the world and have someone restricted

14   from even borrowing a phone.  So, for all of these reasons,

15   I am detaining the defendant as a danger and a serious risk

16   that he will obstruct or attempt to obstruct justice or

17   threaten, injure or intimidate or attempt to do so regarding

18   Victim K and perhaps other witnesses.

19          So, sir, you will be detained pending further

20   proceedings.

21          Is there anything further from the government?

22          MS. JENNIS:  No, Your Honor.  Thank you.

23          THE COURT:  From the defense?

24          MR. CAIN:  Nothing further.

25          (Proceedings adjourned.)

UNITED STATES DISTRICT COURT

1

<u>C E R T I F I C A T E</u>

2

3          I, BARBARA H. STOCKFORD, court-approved transcriber,

4   certify that the foregoing is a correct transcript from the

5   official electronic sound recording of the proceedings in the

6   above-entitled matter.

7

8          DATED at Phoenix, Arizona, this 20th day of May 2020.

9

10

11                            s/Barbara H. Stockford
                              Barbara H. Stockford

12

13

14

15

16

17

18

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT