TIMOTHY COURCHAINE
United States Attorney
District of Arizona
GLENN B. McCORMICK
Assistant U.S. Attorney
Arizona State Bar No. 013328
Two Renaissance Square
40 N. Central Ave., Suite 1200
Phoenix, Arizona 85004
Telephone: 602-514-7500
Email: glenn.mccormick@usdoj.gov
Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America,<br><br>                Plaintiff,<br><br>  vs.<br><br>Chauncey Hollingberry,<br><br>                Defendant. | CR- 20-00673-PHX-MTL<br><br>**UNITED STATES' RESPONSE TO DEFENDANT'S MOTION FOR EARLY TERMINATION OF SUPERVISED RELEASE, DOC. 230** |

Now comes the United States of America, by and through its undersigned attorneys, and moves the court to deny Chauncey Hollingberry's Motion for Early Termination of Supervised Release.

Respectfully submitted March 7, 2025.

                                        TIMOTHY COURCHAINE
                                        United States Attorney
                                        District of Arizona


                                        _____
                                        GLENN B. McCORMICK
                                        Assistant U.S. Attorney

**MEMORANDUM**

**Defendant's Criminal Conduct:[1]**

Chauncey Hollingberry ("the defendant") engaged in video and audio recording at various public sites, including the lobbies of government buildings as a form of what he considers journalism. As such, the defendant considered these activities to be protected by the First Amendment of the United States Constitution. After being unceremoniously expelled from one such lobby, the defendant became aware of the identity of an employee there whom he considered to be responsible for his ouster. That employee is the victim of the charged conduct. After his removal from that government lobby, the defendant began an online cyberstalking campaign against the victim.

On or about and between January 8, 2020, and February 2020, the defendant knowingly used various facilities of interstate commerce to engage in a course of conduct that would be reasonably expected to cause substantial emotional distress to the victim, with the intent to harass or intimidate the victim. Specifically, the defendant posted approximately 11 videos to his public YouTube channel and at least one to his personal web site regarding the victim. The videos, taken as a whole, disclosed the victim's likeness, full name, date of birth, home address, cellular telephone number, employer (a law enforcement related government agency), and work title, work address, and work telephone number, as well as other personal details about the victim. The defendant called the victim derogatory names, including "bitch" and "hoe." The defendant solicited his thousands of YouTube followers to help him gather personal information such as names, photos, and home addresses of all employees of the victim's employer so that he could post them online too, hoping the other employees of the employer would blame the victim. The defendant's followers obliged, also providing him with information about the victim's prior arrest,

---

[1] Most of the factual information in this section is excerpted from the Factual Basis section of the Plea Agreement which the defendant admitted on the record on May 19, 2022.

which resulted in the defendant posting the victim's arrest record, including date of birth. physical description, and mugshot. The defendant also threatened to email the victim's mugshot and nude photographs of the victim, that the defendant suggested were available online, to everyone working at the victim's place of employment, and later claimed to have sent the email to "about a hundred people" at the victim's place of employment and other places, including news outlets. The defendant also encouraged his followers to send marijuana to the victim at her work address, telling them, "I don't care how much money or how much time it takes, I'm taking that bitch down ..."

Some of the victim's responses to the defendant's harassment led to further retaliation by him against the victim. The defendant was especially upset when the victim used social media platform reporting mechanisms to have some of the defendant's harassing posts about the victim blocked or removed. Also, on January 24, 2020, the victim had the defendant served with an Injunction Against Workplace Harassment. Later that same day, the defendant posted another YouTube video encouraging his followers to "email bomb" the victim's employer and provided them with a link to a Google Docs drive that contained the name, telephone number, work email address, and position of the victim, and 56 of the victim's coworkers. On or about February 7, 2020, the defendant posted the victim's mugshot online as well as a link to the Maricopa County Assessor's Office web site that linked to a parcel that identified the victim as an owner.

In addition to the online videos, between January 19, 2020, and January 20, 2020, the defendant sent multiple emails to 54 of the victim's coworkers, sometimes including local news outlets, a member of the Arizona House of Representatives, and the Communications Director of the Arizona Judicial Branch, discussing the victim. One email (titled "[victim.]: DRUG ARREST"), included the victim's mugshot (which the defendant claimed to be running "all over Facebook"), stated that the victim was now "famous online," and that the victim should "seek help for [] drug addiction." Another email containing the mugshot was titled "[victim] NUDE PHOTOS," wherein he suggested that "[a]llegedly nude photos are going around of [victim] in shall we say a compromising

position," and provided a search term he suggested would take readers of the email to the online photographs. As a result of the defendant's conduct, a security detail was assigned to the victim out of concern for the victim's personal safety. The victim also limited time spent in public out of fear of running into the defendant or one of his many followers, whom the victim would have no way to recognize and avoid.

**Defendant's Charges and Conviction:**

A complaint (Doc. 3) was filed on March 13, 2020, charging the defendant with one Count of Cyberstalking, Title 18, United States Code, § 2261A(2).  The defendant was arrested the same day and soon after he was ordered detained as a danger pending resolution of the case. (Doc. 10). After protracted litigation over the detention order, including an appeal to the 9th Circuit, and several extensions of time to indict, an indictment was finally returned on October 20, 2020, with the same charge. (Doc. 50).

The defendant entered a guilty plea to the charged count on May 19, 2022. (Minute Entry, Doc. 140 and Lodged Plea Agreement, Doc. 141). The defendant was released on the day of the change of plea hearing,  having served 797 days in custody. On August 19, 2022, the defendant was sentenced to 60 months' probation with several Special Conditions, some notably limiting the defendant's access to and use of the internet because of his use of the internet to commit his crime. (Judgment and Conviction, Doc. 152).

**Defendant's Probation was Revoked:**

The defendant began having issues with probationary supervision soon after the sentencing hearing.  Defendant filed a Motion to Modify on September 8, 2022, less than a month after being placed on probation. (Doc. 158). Several hearings, pleadings, status reports, and strained communications between supervising probation officers and the defendant followed.  Eventually, a petition to revoke probation was filed on March 9, 2023, alleging that the defendant had failed to meet with the probation officer as required, defendant had accessed the internet in violation of conditions imposed by the court, and defendant had failed to make best efforts to remove certain posts from social media accounts as required. (Doc. 178). The defendant was arrested on March 10, 2023 (Doc.

188), and detained pending resolution of revocation proceedings. (Doc. 184, Amended in Doc. 199). After a revocation hearing, the defendant was determined to be in violation of Special Condition 10 for failing to make best efforts to remove social media postings that related to the victim and his Cyberstalking crime. (Doc. 203). The May 11, 2023, disposition hearing resulted in the defendant's 60-month term of probation being revoked, only 9 months after it had been imposed. The defendant was sentenced to time served, which included 797 days pre-sentencing and 61 days during revocation proceedings, and was placed on three-years' supervised release, once again with multiple special conditions. (Doc. 205).

**Issues Raised During Supervised Release:**

On December 21, 2023, five months after being place on supervised release, Defendant moved for appointment of counsel to address what he termed, "Constitutional Violations," after the probation officer had seized electronic devices from defendant's home pursuant to a search. (Doc. 210). The search of the defendant's home and seizure of the devices was done pursuant to the reasonable suspicion clauses in the special conditions of supervised release. The probation officer sought forensic analysis of the electronic devices to determine if the defendant had been using them in violation of supervised release conditions. Ultimately, the forensic analysis was unable to determine if violations had occurred and the devices were returned to the defendant. No violations of internet access related conditions could be documented, and no petition was filed.

On May 16, 2024, defendant moved for a change of Special Conditions of supervised release (Doc. 218), specifically requesting the court to remove Special Conditions 3, 4, 5, and 6 because limitations on access to the internet and social media were severely restricting economic opportunities.

On August 7, 2024, defendant moved the court once again to change Special Conditions of supervised release (Doc. 226), specifically to address his probations officer's refusal to allow the defendant to create a public facing website to sell his "exquisite art."

After discussions between the defendant and United States Probation officers, an agreement was reached that addressed the concerns the defendant raised in documents 218 and 226. The agreement rendered the motions moot, and they were not substantively ruled upon by the court. (Doc. 228).

The defendant began serving a 36-month term of supervised release on May 11, 2023, after his five-year term of probation was revoked, having only completed nine months of supervision while on probation. As of the date of this pleading, the defendant has completed approximately 21 of the 36-month term of supervised release.

**Legal Standard for Early Termination:**

Pursuant to 18 U.S.C. 3583(e)(1), "… after considering the factors set forth in section 3553(a)(1), (a)(2)(B), (a)(2)(C), (a)(2)(D), (a)(4), (a)(5), (a)(6), and (a)(7)[2] ... [the

---

[2] "(1) the nature and circumstances of the offense and the history and characteristics of the defendant;

"(2) The need for the sentence imposed –

...

"(B) to afford adequate deterrence to criminal conduct;

"(C) to protect the public from further crimes of the defendant; and

"(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

....

"(4) the kinds of sentence and the sentencing range established for –

"(A) the applicable category of offense committed by the applicable category of defendant ...

"(5) any pertinent policy statement –

"(A) issued by the Sentencing Commission pursuant to 28 U.S.C. § 994(a)(2) ... that is in effect on the date the defendant was sentenced; and

court may] terminate a term of supervised release and discharge the defendant released at any time after the expiration of one year of supervised release, pursuant to the provisions of the Federal Rules of Criminal Procedure relating to the modification of probation, if it is satisfied that such action is warranted by the conduct of the defendant released and the interest of justice[.]" The burden is on the defendant to demonstrate that early termination is justified. *United States v. Weber*, 451 F.3d 552, 559 n.9 (9th Cir. 2006). While some courts have held that "exceptionally good behavior" is required to qualify for early termination, the Ninth Circuit made it clear that is not the standard. *United States v. Ponce*, 22 F.4th 1045, 1047 (9th Cir. 2022). While "exceptionally good behavior" may justify early termination, the determination is one that is within the sound discretion of the court, taking into consideration the factors in Title 18, U.S.C. § 3583(a) and a determination that the court, "is satisfied that such action is warranted by the conduct of the defendant released and in the interest to justice." *Id*, quoting Title 18, U.S.C. § 3583(e)(1).

It is not uncommon for courts to find that mere compliance with terms of supervision is insufficient to justify early termination. *See United States v. Lane*, 2024 WL 357041 (D. Idaho 2024) (defendant claimed he had complied with supervision requirements, but "[a]s a general matter, supervised release does not become unnecessary simply because a person has complied with the requirements of supervision"), and *United States v. Espersen*, 2021 WL 1392055 (D. Idaho 2021) (the totality of the circumstances did not support early

---

"(B) that, except as provided in section 3742(g), is in effect on the date the defendant is sentenced.

"(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

"(7) the need to provide restitution to any victims of the offense."

18 U.S.C. § 3553(a)(1), (2)(B)-(D), (4)-(7).

- 7 -

termination despite 20 months of supervision without incident and evidence of growth in light of the gravity of the underlying crime (child rape) and the lack of a recommendation for early termination by the probation officer). Mediocre compliance has been held insufficient to justify early termination. *United States v. Kline*, 2021 WL 3123344 (D. Arizona 2021) (defendant had fairly consistent compliance, but he submitted blank monthly reports, and failed to practice skill-building, claiming he was unable to learn any skill). However, mere compliance may also be considered sufficient in the discretion of a court. *See generally United States v. Garcia-Rivas*, 711 F.Supp.3d 126  (D. Oregon 2024) (early termination granted because the defendant successfully reintegrated into the community, had no new criminal conduct, this was his sole conviction, and need for supervision to deter or protect the public was low).

The defendant has not met his burden to demonstrate that early termination of supervised release is justified. In support of his request, the defendant argues that his status as a "non-career, non-violent offender," lack of prior criminal history, that he lives in fear of the victim and poses no risk to the victim, he has only committed a single "low-grade violation," he has remained employed, he is working on a college degree, and he is building a business, support early termination.  Nothing in the defendant's motion suggests he has exhibited anything more than "mere compliance" and the record in this case establishes that it would be grade-inflation to describe the defendant's performance as satisfactorily in-compliance. Throughout probation and on supervised release, the defendant has at best remained on the bubble and has never done well by any objective measure.  He has cycled through multiple probation officers and has constantly angled to reduce supervision when such reductions were not justified. While the court and probation officers have made some changes to special conditions, the reasons for those changes can be best characterized as the court and probation officers bending over backwards to work through the difficulties presented by the defendant and are not a result of good performance by the defendant. Therefore, the request for early termination should be denied.

**<u>Defendant's Conduct does not Warrant Early Termination:</u>**

Despite the evidence against him and his admission to the facts noted above during his change of plea hearing, on multiple occasions during supervision, the defendant has asserted that he is innocent[3], attempted to circumvent or modify away conditions related to internet access, and sought to terminate probation because he did not agree that it was necessary or appropriate. For example:

1. In a letter faxed by the defendant on December 23, 2022, the defendant wrote:

    "Please let [Assistant United States Attorney ("AUSA")] know that if he attempts to obtain a court order to take down my social media channels, I will take legal action against the United States Government. I will take legal action to keep my social media sites online."

    At the time, the defendant was under conditions of supervision requiring him to remove certain information from social media platforms. Defendant claimed he did not recall passwords to the sites and could not comply. When advised to use "forgot password" functions on the sites, the defendant claimed that any use of that function would require him to have the cellular telephone he had when he created the accounts, which he claimed not to have. Despite his contentions he opposed the sites being closed as an alternative. After the defendant's probation was revoked, the court granted (Doc. 209) the United States Motion to Modify Special Conditions of Supervised Release to Require Defendant to Permanently Close and Delete You

---

[3] Since admitting the Factual Basis in the Plea Agreement, the defendant has consistently asserted his innocence and claims the prosecution was based upon illegitimate political reasons. For the first time since the change of plea hearing, in his Motion for Early Termination of Supervised Release, the defendant admits that he was "harassing" the victim. Doc. 230, Motion for Early Termination of Supervised Release, p. 4. However, that admission is buried in further claims that their spat was precipitated by inappropriate, politically motivated, government actions due to disagreements with the defendant's political views. Id. These claims have been and remain the defendant's opinion, but they are not supported by facts.

Tube, Gmail, Facebook (Meta), Twitter, and Vimeo Accounts (Doc. 207). Doc. 207 describes the saga of getting those accounts closed in great detail and is incorporated herein by reference.

2. In a February 11, 2023, email to the probation officer and AUSA, the defendant wrote:

   "Because of your behavior and that of the United States Government, I have no choice but to request political asylum. Probation Terminated!"

3. In a February 15, 2023, email to approximately 200 foreign embassy recipients, the defendant wrote:

   "The United States Government has issued a false and misleading press release regarding our editor, [the defendant]. This behavior follows a pattern of the U.S. Government's use of harassment, threats, intimidation, defamation, and <u>malicious criminal charges(s) to silence and defame independent journalists reporting on U.S. Government corruption</u>. (emphasis added).

   Wikiitem.com will launch on or about May 1, 2023. Our mission statement at Wikiitem.com is U.S. Government: Bring your weapons; Bring your guns; And we will bring our words."

4. In an unsigned pleading by the defendant that was attached to an email sent to the assigned AUSA on February 15, 2023, the defendant wrote in part:

"[Victim]
   …
   - [Victim] was a government official with the [employer].
   - [Victim] used [victim's] government position to harass, threaten, and intimidate [defendant] with the approval of the government.
   - [Victim] is a crisis actor employed/utilized by the United States Government to harass [defendant].
   - [Victim] ordered the Phoenix Police Department to tackle and arrest [defendant] for reporting on corruption within the [victim's employer], which they did.

- [Victim] stalked [defendant] on the internet.
- [Victim] contacted YouTube on multiple occasions with an order to remove [defendant's] content from the internet.
- …
- [defendant] has witnessed the United States Government aid the above individuals to harass, threaten, defame, and intimidate [defendant] for his political opinions."

5. In an email to the AUSA on February 17, 2023, the defendant wrote:

    "The plea agreement between the Government and me is now terminated. I am moving to terminate this probation as well. The U.S. Government's illegal behavior will no longer be tolerated."

6. In an email to the probation officer and AUSAs on February 11, 2023, the defendant wrote:
    "ARE YOU READY TO SHOOT ME ON CAMERA? I AM NOT GOING TO BE HARASSED NOT ONE MORE DAY BY YOU THUGS!"

7. In an email to the AUSA and others on February 28, 2023, the defendant wrote:

    "Wikiitem.com has chosen to move forward with a lawsuit against the Government for defamation. We have two years to file the claim and then file the lawsuit.

    If the Federal or State Governments attempt to stop us from filming for news purposes in any public area of a Government building, we will file a federal and state lawsuit."

    We will be filming for news in the [victim's employer's] and [AUSAs] offices.

    Bring your guns and weapons; We will bring our words."

8. In a February 28, 2023, email from the defendant's attorney to the probation officer, copying the AUSA, it was stated in part that:
    "… I present to you a list of [defendant's] requests. I am hoping that you, as his supervising probation officer, can accommodate these.

    He would like to be able to use the internet without continually asking for special permission to do so. … I understand he is being monitored by you

and your office, and as long as he stays away from "[the victim]", there would appear to be no problem with his navigation of the web. [The defendant] also takes his role as a disseminator of information to the public as an important part of his existence, as is evidenced by his press releases. Perhaps some mutual understanding can be accomplished in this regard. …"

The probation officer responded on March 8, 2023, as follows:

"I have reviewed your email below and have some concerns with your client. Specifically, he is not complying with his conditions as ordered by the court. Therefore, I find it very difficult to support a modification of his conditions.

If you would like to modify any of his condition(s), you would have to motion the Court. However, I support the special conditions as currently imposed.

Lastly, [the defendant] has now emailed me two concerning emails, that I believe you were copied on.

I hope this email clarifies your questions."

9. In a March 8, 2023, email to the probation officer and cc'd to over 200 international agencies, organizations, and embassies, the defendant wrote:

"I am seeking political asylum because You [sic] and your friends in the United States Government continue to harass and defame me. This case was a fraud. Journalism is not a crime. I am leaving the Country for my safety."

10. In another March 8, 2023, email from the defendant to the probation officer and AUSA, with a photograph of a commercial airliner in flight, the defendant communicated:

The website is or will be going live shortly; it is in a state of construction.

[photograph]

I have chosen to terminate the plea agreement.

11. In a March 10, 2023, email from the probation officer to the AUSA, the probation officer paraphrased a statement the defendant made upon his arrest for alleged probation violations wherein according to the probation officer the defendant stated:

> "He repeated several times that the plea agreement was terminated, the moment he is released he is fleeing the county, and probation is terminated. He advised USPO that he is no longer going to comply with any probation conditions and that the whole world knows about the corrupt US government and what USPO is doing to him."

In November of 2023, a little more than six months after his probation was revoked, the defendant sent emails to the probation officer and AUSA, requesting to have supervision terminated, claiming it was "unproductive."

The defendant's interactions with supervising probation officers have been contentious. His current probation officer recommends against early termination for the following reasons:

1. The defendant has engaged in defiant behavior with prior probation officers, a supervisory probation officer, the Court, and the AUSA assigned to this case. His behavior appears to be guided by his belief that he was wrongfully convicted and is a victim of the criminal justice system.
2. In July 2024, the defendant made statements to the previously assigned probation officer and supervisory probation officer justifying his conduct during the instant offense by discussing the victim's behavior and statements during his First Amendment audit videos. He stated, "She was asking for it."
3. The defendant has threatened probation staff with media exposure and legal action on multiple occasions. He last did this in July 2024.
4. The defendant appears to have attempted to obstruct probation officers from supervising him. In December 2023, the defendant emailed the probation officer and stated she would have to "put a bullet in [his] head" before arresting him and taking him back into custody. This was in response to the officer asking him to meet with her at the office. He later apologized in a follow-up email and stated he has severe trauma related to this criminal case. In February 2024, the probation officer had trouble conducting home visits on the defendant as he would not answer emails

or the phone. The probation officer, with a supervisor, attempted to visit The defendant at work. When he observed the officer and supervisor, the defendant refused to make contact and walked back to his work area. This was a violation of his standard condition requiring him to allow the officer to visit him at his home or elsewhere.

5. Due to the factors detailed above, the probation officer is not fully confident the defendant is able to lawfully self-manage once supervision terminates. This combined with his history of animosity toward the victim, presents a concern that early termination could pose a risk of harm to the victim or other potential victims.

6. The defendant's apparent failure to take accountability for his conduct in the instant offense and demonstrate true changes to his thinking and antisocial attitudes beyond superficial compliance with court-ordered conditions, are additional factors that support denying early termination at this time.

While the defendant may claim the fault lies with those who have prosecuted and supervised him, at least four probation officers and supervisors, an investigating FBI agent, and three AUSAs have diametrically opposing views. The defendant may be able to successfully continue in his obstreperous ways through the remaining 15 months of his term of supervised release without further violations, but his performance to date does not justify early termination.

**Conclusion:**

It became clear soon after the defendant was sentenced that he has not accepted responsibility for his criminal acts. In fact, the change of plea hearing discussion of the factual basis was not exactly smooth. The defendant believes the prosecution was a fraud, that it is a government attempt to silence him, and that his actions are protected by the First Amendment. The defendant views the prosecution as political, not the logical result of his criminal cyberstalking. The defendant only begrudgingly admits his acts of harassment and claims himself to be the actual victim of government persecution for his political views. The defendant has not submitted to supervision as required by the court and his request to

terminate supervision early is just another attempt to avoid responsibility for his criminal acts. The defendant remains defiant to the authority of the court to impose supervised release conditions and of probation officers to enforce those conditions.

It is not uncommon for a probation officer to request early termination of supervised release when an offender has taken significant steps toward rehabilitation and has demonstrated a recognizable change to the thinking and behavior that contributed to their criminal conduct. Indeed, the United States often does not oppose early termination under those circumstances. However, the defendant's performance on probation and supervised release shows no such rehabilitation or change. In addition to his claims that the whole prosecution is a fraud, the defendant's supervision has been punctuated by repeated attempts to remove conditions and obstruct the probation officers that have been assigned to him, rather than consider supervision as a time to reflect upon the wrongfulness of his criminal conduct and for positive growth and development.[4] Therefore, the United States requests the court to deny the defendant's Motion for Early Termination of Supervised Release.[5]

---

[4] When denying or granting a defendant's request for early termination of supervised release, a court must provide an explanation that is "sufficiently detailed to permit meaningful appellate review" and "state[s] the court's reasons for rejecting nonfrivolous arguments." *United States v. Emmett*, 749 F.3d 817, 821 (9th Cir. 2014).

[5] "[A] federal district court need not hold a hearing before ruling on a defendant's motion for early termination of probation" or supervised release. *United States v. Hawatmeh*, 2014WL11970544 (CD CA 2014) quoting *United States v. Robins*, No. LA CR 08-01497-VBF Doc 81 at 4 (C.D. Cal. May 27, 2014) (citing *United States v. Floyd*, 491 Fed.Appx. 331, 333 (3rd Cir. 2021)(discussing FED. R. CRIM. P. 32.1(c)(2), which presumptively requires the court to hold a hearing "[b]efore modifying the conditions of probation or supervised release", not before ruling on a motion for early termination of probation or supervised release)).

**CERTIFICATE OF SERVICE**

I hereby certify that on 7th day of March, 2025, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing. A copy has been mailed to the Pro Se defendant at the following address:

Chauncey Hollingberry, *Pro Se*
4415 N. Maryvale Parkway, Suite 23051
Phoenix, Arizona 85031

_____
U.S. Attorney's Office