TO FEDERAL AND/OR LOCAL RULES AND PRACTICES
AND IS SUBJECT TO REJECTION BY THE COURT.

REFERENCE *CIVL 5.4*

(Rule Number/Section)

___ FILED        ___ LODGED
___ RECEIVED     ___ COPY

MAR 1 1 2025

CLERK U S DISTRICT COURT
DISTRICT OF ARIZONA
BY_____ DEPUTY

Chauncey Hollingberry

4415 North Maryvale Parkway Ste. 23051

Phoenix, Arizona 85031

editor@chaunceyart.com

# UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

UNITED STATES OF AMERICA,

        Plaintiff,

vs.

CHAUNCEY HOLLINGBERRY,

        Defendant.

Case No.: **CR-20-00673-PHX-MTL**

**MOTION FOR SANCTIONS RULE 11 (B)**

    NOW COMES, CHAUNCEY HOLLINGBERRY, "Defendant," for his MOTION FOR SANCTIONS RULE 11(b). The Court has a right to consider this motion for sanctions against AUSAs Lisa Jennis "Jennis," Christine Keller "Keller," and other persons under Rule 11 (b). This motion complies with Local Federal Rule 7.1 (d), which limits motions to twenty pages.

MOTION FOR SANCTIONS RULE 11 (B) - 1

## MEMORANDUM OF POINTS AND AUTHORITIES

**Events Giving Rise to Motion**

The Defendant has been under court-supervised release for 36 months. On May 11, 2023, the Defendant's original sentence of probation was revoked following the Defendant's attempt to flee the country to seek protection from The United States Government, Lauren Reimer, Jamie Morano, Mark Schoenberger, Charles Cook, and CK; the subsequent violation proceeding followed. Per the Order Revoking Probation, the Court has implemented both Special and Standard Conditions outlined in General Order 17-18, Order Revoking Probation, Doc 205. The Court signed a Waiver and Order Modification of Supervised Release Conditions on August 19, 2024, Doc 229. This motion pertains to the following special condition:

1. "You must not contact the following victim(s) and other people: C.K., C.C, M.S., J.M., or L.R., and the probation officer will verify compliance. Prohibition on contact with C.C. applies unless otherwise permitted by the probation officer in the context of civil litigation, and the probation officer will verify compliance."

**Rule 11(b) Representations to the Court**

"Representations to the Court. By presenting to the court a pleading, written motion, **or other paper**—whether by signing, filing, submitting, **or later advocating it**—an attorney or unrepresented party certifies that to the best of the person's knowledge, information, and belief, formed after an **inquiry** reasonable under the circumstances:

MOTION FOR SANCTIONS RULE 11 (B) - 2

(1) it is not being presented for any improper purpose, such as to harass, cause

unnecessary delay, or needlessly increase the cost of litigation;

(2) the claims, defenses, and other legal contentions are warranted by existing law

or by a nonfrivolous argument for extending, modifying, or reversing existing law

or for establishing new law;

(3) the factual contentions have evidentiary support or, if specifically so identified,

will likely have evidentiary support after a reasonable opportunity for further

investigation or discovery; and

(4) the denials of factual contentions are warranted on the evidence or, if

specifically so identified, are reasonably based on belief or a lack of information."

**Rule 11 (c) Sanctions**

"(c) Sanctions.

(1) *In General.* If, after notice and a reasonable opportunity to respond, the court

determines that Rule 11(b) has been violated, the court may impose an appropriate

sanction on any attorney, law firm, or party that violated the rule or is responsible

for the violation. Absent exceptional circumstances, a law firm must be held

jointly responsible for a violation committed by its partner, associate, or employee.

(2) *Motion for Sanctions.* A motion for sanctions must be made separately from

any other motion and must describe the specific conduct that allegedly

violates Rule 11(b). The motion must be served under Rule 5, but it must not be

filed or be presented to the court if the challenged paper, claim, defense,

MOTION FOR SANCTIONS RULE 11 (B) - 3

contention, or denial is withdrawn or appropriately corrected within 21 days after service or within another time the court sets. If warranted, the court may award to the prevailing party the reasonable expenses, including attorney's fees, incurred for the motion.

(4) *Nature of a Sanction.* A sanction imposed under this rule must be limited to what suffices to deter repetition of the conduct or comparable conduct by others similarly situated. The sanction may include nonmonetary directives; an order to pay a penalty into court; or, if imposed on motion and warranted for effective deterrence, an order directing payment to the movant of part or all of the reasonable attorney's fees and other expenses directly resulting from the violation.

(6) *Requirements for an Order.* An order imposing a sanction must describe the sanctioned conduct and explain the basis for the sanction."

**Events Giving Rise to Sanctions Motion**

On March 20, 2020, or thereabouts, and for a significant period thereafter, the then prosecutor for this case, Lisa Jennis, presented this Court and then Magistrate, Deborah Fine, *a pleading, written motion, or other paper* with false and misleading information that contained *factual contentions that did not have evidentiary support in violation of FRCP 11 (b) (3).* The false contentions contained within written motions and pleadings were provided to this Court and Magistrate Fine during the detention hearing and thereafter.

MOTION FOR SANCTIONS RULE 11 (B) - 4

## SANCTIONABLE OFFENSES

The Defendant was initially charged with Cyberstalking in violation of Title 18, United States Code 2261 § A (2). The false contentions began in the Defendant's initial attempt to gain pretrial release.

### I.    Foundation Charles Cook, Craig Cook & Family Members

In Jennis' request to detain the Defendant, the Prosecutor presented a series of bizarre and unfounded claims that were unrelated to the actual charge of Cyberstalking against the government official, CK.

To provide the Court with context, in the months leading up to the Defendant's arrest, Mr. Hollingberry began publicly discussing his experiences as a victim of child abuse, implicating his uncle, Charles, along with members of Charles's family, his grandmother, and grandfather; Charles and Harriet Cook, and others members of the Cook family. Hollingberry also raised concerns regarding the embezzlement of funds from the Defendant's mother's trust by Charles and his brother, Craig, who both serve as Trustees of The Silverado Trust.

Charles Cook subjected Hollingberry to multiple forms of child abuse: mental/emotional abuse and child neglect. Mr. Cook has been falsely claiming since the Defendant was twelve years old that Hollingberry is homosexual and loves "big black cocks." Charles believes homosexuality is a sin, and consequently, Mr. Cook has stated that the Defendant should be killed. In fact, Mr. Cook has made death threats against the Defendant.

The Defendant's family is a wealthy, dysfunctional, and abusive family, and some are public figures in the Christian religious community by way of donations to high-profile religious organizations and churches in California like IRIS Global, led by Heidi Baker and Rolland Baker, a husband-and-wife team. As the saying goes, money talks, and sugar and BS walk. Charles is desperate to silence Hollingberry because Defendant decided to expose the corruption in the Cook family, including Defendant's knowledge about the family's long history of child abuse and his uncle's possession of child pornography.

The Defendant's grandmother, Harriet Cook, went hunting for more sugar daddies after her divorce from her sugar-daddy husband, Charles Cook, who went by the name of Gene. She employed herself as a "caregiver" to elderly wealthy men in the Scottsdale and North Phoenix area and pimped them out for cash. Harriet would manipulate her clients into giving her money, cars, and other valuable possessions in exchange for her "comfort services." Unfortunately, Harriet Cook was an escort, posing as a caregiver.

Unfortunately, Charles Cook is dishonest and an expert at deception. Mr. Cook was arrested for embezzlement of $30,000 from Pfastship Worldwide Logistics, which his father, Gene Cook, owned. The Defendant witnessed Charles being handcuffed by law enforcement in his father's office, and Charles agreed to return the stolen funds to Pfastship Worldwide Logistics in exchange for no charges. Except the deception goes further, Mr. Cook has provided false and misleading information to his donors and

MOTION FOR SANCTIONS RULE 11 (B) - 6

friends, i.e., Heidi Baker and Rolland Baker of IRIS Global, that he owned Pfastship Logistics- a complete fabrication.

The Silverado Trust, created by the deceased, Gene Cook, mandated both trustees to establish a separate trust for the Defendant's mother and aunt, complete with a distinct EIN from the IRS. In the event of either beneficiary's death, the children of the beneficiaries were to receive any proceeds from this separate trust(s). However, Charles and Craig devised a scheme to circumvent this requirement. Instead of creating an individual trust(s), they retained the existing trust, The Silverado Trust, with its existing EIN. They embezzled all the funds by transferring them to Craig's personal checking account and personal investments. Both trustees utilized one or both of their Social Security numbers while listing the checking accounts and investment(s) under their name(s) instead of the Silverado Trust. Based on information and belief, Charles' attorney for the trust, George Chant, stated that he believes his clients want the trust money.

The fraud of the trustees continues, however; upon information and belief from a reliable source, the Defendant's grandmother, Harriet Cook, embezzled, with the help of her son, Craig Cook, $20,000 from the trust to pay her property taxes for her condo in California. Additionally, upon information and belief, the deceased who created the trust had a life insurance policy for $1,000,000; it is the Defendant's belief upon evidence that all those funds were embezzled and given to the Defendant's grandmother.

MOTION FOR SANCTIONS RULE 11 (B) - 7

The trustees had intended, and continue to plan, to embezzle any remaining funds from these two individuals—the Defendant's mother and aunt— in the event of their passing and give the funds to their children, not the beneficiaries' children. Essentially, Charles and Craig are attempting to defraud Hollingberry.

To silence the Defendant, Charles began making false and misleading reports to law enforcement, alleging that the Defendant was abusing his mother and holding her hostage to steal her trust funds. Charles submitted these false reports to The Maricopa County Attorney's Office and other law enforcement agencies. Charles did not have any evidence to support his claims. *To be clear to the Court, the Trustee, Charles, did not make these false claims until after Defendant accused him of embezzlement and child abuse.*

Not only did Charles fabricate police reports, but he also organized a group, including hiring a private investigator to investigate and follow Hollingberry and research the Defendant's political opponents. Charles conspired with Jamie Morano, Mark Schoenberger, and Lauren Reimer to jail the Defendant. Charles and his co-conspirators Jamie M., Mark S., and Lauren R.  kept in constant contact with each other by phone and private chat rooms, wherein they altered their complaints against the Defendant to match each other's complaints and tag teamed the Defendant, creating false police reports against Hollingberry.

## II.    The Office of the Attorney General & The Jewish Community

The Arizona Attorney General's Office "Office, AG" has been frustrated since the year 2018 with the Defendant's videotaping of the outside and publicly accessible areas of the Office, his refusal to stop filming, despite filming being a First Amendment-protected activity, and his postings of embarrassing information on the AG Office including allegations the employees of the office watch pornography at work. Thus began a years-long campaign of harassment against the Defendant by the Office.

In July 2018, the AG's Office contacted the Phoenix Police Department to arrest the Defendant for videotaping in the public lobby of the Office, which is the body camera video that ultimately led to this case. The Defendant was attacked by law enforcement and charged with trespassing; ultimately, the charge was dismissed because the Government has acknowledged the Defendant has a First Amendment constitutional right to film in public areas of government buildings. However, the AG's Office continued their lawfare against the Defendant by ordering the Defendant's YouTube videos taken down, ultimately leading to the confrontation with CK.

In 2019, Hollingberry attempted to obtain public records of internet history from the AG's Office to confirm the corruption within the Office, including but not limited to pornography and inappropriate activity on social media. Upon information and belief, the employees of the Office watch pornographic movies, including but not limited to *Tasty Pussy 4, Latex Latinas, Busty Latinas, Bad Bitches, Extasy Island, Paradise Island,* and

MOTION FOR SANCTIONS RULE 11 (B) - 9

*Daddy and Master.* The AG Office hid the requested data and declined to provide the Defendant with the internet history records.

In 2018 and thereafter, the Office began to make privacy complaints on the Defendant's YouTube videos, claiming government officials in public places are protected from photography; it wasn't just a complaint; it was an order, and thus, the videos were removed.

The Office became even more frustrated when the Defendant continued to video and post on the AG Office in 2018, 2019, and 2020. The Office, in 2020, obtained an ex parte Injunction Against Harassment against the Defendant on behalf of the then Attorney General, Mark Brnovich and CK, with multiple false allegations including but not limited to a claim the Defendant was threatening the AG, which was untrue.

In February of 2020, an entourage of two special agents from the AG Office and the then Arizona Attorney General, Mark Brnovich, followed Hollingberry from his home to his work at the corporate office of Home Depot; when Defendant arrived at work, the two agents jumped out of the AG's red pickup truck while the then attorney general stayed behind in the truck. The agents began to bang on the Defendant's newer model Honda Civic saying, "Come out, mother fucker" and "You want to film our fucking office, bitch." The agents tried to force their way into the Defendant's car to no avail. Finally, in frustration, the agents placed the Injunction Against Harassment on Defendant's windshield and left.

MOTION FOR SANCTIONS RULE 11 (B) - 10

**Lisa Jennis & The Jewish Community**

Lisa Jennis "Jennis" is a member of the Jewish Community and a former attorney for the Arizona Attorney General's Office before she became a United States attorney. Jennis was an attorney for the AG Office when Hollingberry, during the times the Defendant, was engaged in filming activities against the Office.

Hollingberry is an outspoken critic of the Jewish Community "Community"; unfortunately, the Community hides behind the tragedy of the Holocaust and utilizes Hitler's Playbook; the Community uses the tragedy to engage in genocide against the Palestinian People alongside the United States Government.

In 2020, the Defendant began to protest outside of multiple synagogues, and thereafter, the Jewish Community in Arizona started to stalk the Defendant. An Israeli Defense Soldier by the name of Aaron McKinney visited Hollingberry's home on multiple occasions on the orders of Jamie M. with a camera, gun, and a drone; he would film himself stalking the Defendant and post the videos on Facebook. The FBI was aware, and not only was Aaron not charged, but the FBI supported the behavior just like they supported the stalking behavior of Jamie M. Mark S. and Lauren R. Ultimately, the individual received an Injunction Against Harassment to stay away from Hollingberry's home, which he complied with. The gang stalking from the Jewish Community continued, however, with the Community creating posts on social media urging the Defendant to come to their respective synagogues so they could shoot him and for him to bring a gun for the fight to be fair.

MOTION FOR SANCTIONS RULE 11 (B) - 11

### III.    The Gang Stalkers: Jamie Mark and Lauren

In 2017, Mr. Hollingberry began exercising his First Amendment rights through a practice known as First Amendment Auditing on YouTube. He would film government buildings and their public areas, documenting interactions with government officials and law enforcement who attempted to silence him or impede his right to free speech. His goal was to gather evidence of potential government corruption.

***Jamie Morano, Mark Schoenberger, and Lauren Reimer are professional internet trolls who lead double lives as teachers, IT technicians, and spokespersons by day, respectively, and engage in online gang stalking after hours using multiple fake social media accounts.*** These individuals have engaged in organized gang stalking of Defendant since 2017.  All three individuals are top lieutenants in a United States Government troll farm run by an Attorney, Jon Emerson Rietveld, California Bar #320086, known on YouTube as Merb, YouTube channel *Merb34st*. Mr. Rietveld and said individuals encountered the Defendant when they stumbled upon his videos on social media. All three individuals, including Merb, are internet stalkers who collectively maintain hundreds of fake social media accounts designed to cyberstalk those critical of law enforcement and the government. All the above individuals are staunch supporters and friends of law enforcement, and they take issue with the Defendant's criticism of law enforcement and the government, as well as his First Amendment Audit videos that are publicly available online.

MOTION FOR SANCTIONS RULE 11 (B) - 12

**Jamie M. and Mark S.**

In December 2017, Jamie M. and Mark S. began a relentless campaign to post defamatory and offensive content on the Defendant's personal Facebook page. They enlisted the help of friends, followers, and family members to share similar posts, disclose the Defendant's home address and workplace information, and urge their followers to contact the Defendant's employer to report him.

In March of 2018, Jamie M. and her followers on Facebook, YouTube, and other social media platforms plastered Defendant's employer, Waste Management, with phone calls and emails with complaints about Defendant's YouTube channel and made allegations that Hollingberry worked for Isis and Al Qaeda terrorist groups. The false claims and harassment caused Waste Management to hire a private investigator to investigate the allegations Jamie and her co-conspirators were making; the allegations were proven false, but when Lauren R. contacted Wate Management and alleged (falsely) that Defendant was wearing a mask and demanded to film children outside of a school, the Defendant was initially terminated from his employer; however, the general counsel for Waste Management reversed that decision and gave Defendant $7,000 for wrongful termination.

Defendant attempted multiple times to obtain restraining orders against Jamie M. and Mark S., all to no effect because these individuals would hide behind fake screen names and provide misleading information to the Court.

Jamie M., Mark S., and Lauren R. do not operate independently; they receive their directives from the Pinal County Sheriff's Department and various law enforcement agencies in what are referred to as private chat rooms. Mark S. acknowledged the existence of these chat rooms in a letter to the Court and claimed that the Defendant "hacks" into them. ***Within these chat rooms, Jamie M., Mark S., Lauren R., and numerous other individuals conspire about how to harass, threaten, intimidate, and or kill political opponents of law enforcement and anyone critical of the government.***

In 2018, in the Pinal County Superior Court Case # S-1100-CV-201800813, the Defendant sued the Maricopa School District for records revealing Jamie M. utilized District resources to send harassing messages to the Defendant on social media. Jamie M. and her co-conspirator, Mark S., sent a threatening blackmail message to Hollingberry, stating that he would be harmed if he did not drop the lawsuit. The evidence was provided to the Court and submitted as part of the record in the above case. The Defendant dropped the suit out of fear for his safety.

**Lauren R.**

In March 2018, Lauren R., then a reporter for Channel 3 News, created a false news report at the request of various government officials and her friends, Jamie M. and Mark S. In the report, she claimed that the Defendant was at a school wearing a mask and demanding to film children, which was not valid. In reality, Defendant was at the corporate office of the school district without a mask, where he was lodging a complaint about harassment from Mark S. Meanwhile, Mark S., a friend of Lauren R., was posting

MOTION FOR SANCTIONS RULE 11 (B) - 14

the Defendant's home address on Facebook and encouraging others to harm him while he was at work in the school district. As a result of this harassment, the school district issued a reprimand to Mark S. for his use of social media.

## ARGUMENT

In Jennis' Motion for Detention, she made several false allegations in her filing and subsequently advocated for them in violation of Rule 11(b)(3). To clarify for the Court, Lisa Jennis, during her tenure as the prosecutor in this case, seems to mirror the thoughts and feelings of Charles Cook, Jamie M., Lauren R., and Mark S. without providing any evidentiary support or conducting a reasonable inquiry.

**Allegations**

Lisa Jennis alleged that Hollingberry posed a danger to his mother in her motion to detain the Defendant before trial. She used fabricated evidence to support this false claim. Jennis stated that the Defendant's mother expressed fear about leaving her home and claimed that she was afraid of her son, attributing blame to him. However, according to the police report, these statements are entirely false. Jennis manipulated statements made by the Defendant's mother to turn them against the Defendant. In reality, the Defendant's mother never said she was afraid of her son; instead, she indicated that she was concerned for him due to alleged stalking behavior by numerous individuals.

Magistrate Fine found that the Defendant was not a danger to his mother. Did Lisa Jennis stop making this false allegation? No. She escalated the situation. It is known that either Lisa Jennis or someone in her office sent the motion containing various false

MOTION FOR SANCTIONS RULE 11 (B) - 15

allegations to Robert Anglen, a reporter for The Arizona Republic. Anglen is known for his aggressive reporting style and often receives stories and instructions from the government on what to write and whom to attack. He targets individuals before trials and damages their reputations with potentially false and misleading statements. Mr. Anglen created a deceptive and defamatory news report about the Defendant that appeared on the front page of The Arizona Republic, falsely claiming that the Defendant was being charged with abusing his mother—an outright lie.

In May 2022, during the sentencing hearing, the then-prosecutor Christine Keller advocated for a no-contact order for persons Jamie M., Mark S., Lauren R., and Charles Cook. She stated that the Defendant was harassing and stalking these individuals. However, Christine Keller and Lisa Jennis were aware of the evidence Defendant had provided, which indicated that these individuals were gang-stalking him in retaliation for his political beliefs and other reasons. The Defendant and his counsel communicated this information.

Instead of reconsidering her allegations, Keller reinforced her claims and inadvertently gave the gang stalkers power over the Defendant by imposing a no-contact order involving all four individuals. This decision has resulted in years of anxiety for the Defendant and has allowed these individuals to continue their harassment.

All four individuals involved—Jamie, Mark, Lauren, and Charles—sent letters to this Court and subjected themselves to a Rule 11(b)(3) motion by presenting false and misleading allegations in their "other paper."

In her letter advocating for detention, Lauren R. claimed she purchased a gun to use against the Defendant, labeled him a "parasite," and stated that the Defendant had visited her workplace multiple times. However, the Defendant has never visited her workplace or threatened her in any way. Lauren has weaponized the legal system with false and misleading information to multiple courts with allegations she has no evidence of, no videos, no evidence the Defendant has ever visited her workplace, nothing, just her word.

Jamie M. asserted in her letter that she was "shaking in fear" of the Defendant and claimed he was stalking her. These assertions are unfounded. Upon information and belief provided to the Defendant by third parties while in custody, Jamie was laughing on social media about how she got him "locked up." She also sent Hollingberry harassing letters while the Defendant was detained in Florence, Arizona. The Court was made aware of the harassment in 2020.

Mark admitted in his letter that Defendant had not done anything to him but claimed Defendant was "hacking" into "secret" chat rooms and spying on their conspiracy. Additionally, Mark acknowledged that he had been reprimanded for stalking the Defendant. Nevertheless, he still advocated for the Defendant's detention.

In his letter, Charles Cook complained that the Defendant was spreading information about how Mr. Cook and his family had subjected him to child abuse, among other accusations. He, too, advocated for the Defendant's detention.

MOTION FOR SANCTIONS RULE 11 (B) - 17

What all these individuals failed to mention in their misleading letters to the Court is that they were conspiring to silence and imprison the Defendant due to his political views. In Mr. Cook's case, there is also an implication of attempting to defraud and silence the Defendant. Someone in jail can't collect their money.

**RELIEF**

A sanction to deter repetition of the conduct or comparable conduct by others is warranted under Rule 11 (c) (4). Defendant is requesting the following sanction(s) on Lisa Jennis, Christine Keller, Jamie M., Mark S., Lauren R., and Charles Cook:

- The Court to remove the no-contact order for Charles Cook, Lauren R., Jamie M., and Mark S. as a sanction on these individuals for providing this Court with false and misleading letters and other statements submitted to this Court and the Government.

- The Court to order Lauren R., Jamie M., Mark S., and Charles Cook to have no direct or indirect contact with Chauncey Hollingberry, Defendant until further order of the Court.

- The Court to order Lauren R., Jamie M., Mark S., and Charles Cook not to make any defamatory statements public or otherwise about Chauncey Hollingberry to any third party.

- The Court to order Lisa Jennis to make a written apology to Chauncey Hollingberry and Robert Anglen for the false statements she made about the Defendant.

MOTION FOR SANCTIONS RULE 11 (B) - 18

- The Court to order Christine Keller to make a written apology to Chauncey Hollingberry for the false statements she made about the Defendant.

- The Court to order the Department of Justice to publish the apologies as a press release.

Dated this 12th day of March, 2025

_Chauncey Hollingberry_
Chauncey Hollingberry

MOTION FOR SANCTIONS RULE 11 (B) - 19

**Certificate of Service**

  I hereby certify that on the 12th day of March 2025, I mailed a copy of the foregoing to the Clerk of the Court.

   I further certify that on the same day, a copy of the foregoing was mailed to Glenn B. McCormick.

Glenn B. McCormick

Two Renaissance Square

40 N. Central Ave., Suite 1200

Phoenix, Arizona 85004

Glenn.mccormick@usdoj.gov


/s/ Chauncey Hollingberry

MOTION FOR SANCTIONS RULE 11 (B) - 20



PRESS FIRMLY TO SEAL

PRESS FIRMLY TO SEAL

PRIORITY MAIL
FLAT RATE ENVELOPE
POSTAGE REQUIRED

## UNITED STATES POSTAL SERVICE®

PRIORITY MAIL®
MAR 11 2025

CLERK OF THE COURT
UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ARIZONA

- Expected delivery date specified for domestic use.
- Domestic shipments include $100 of insurance (restrictions apply).*
- USPS Tracking® service included for domestic and many international destinations.
- Limited international insurance.**
- When used internationally, a customs declaration form is required.

*Insurance does not cover certain items. For details regarding claims exclusions see the
Domestic Mail Manual at http://pe.usps.com.
** See International Mail Manual at http://pe.usps.com for availability and limitations of coverage.

## FLAT RATE ENVELOPE

ONE RATE ■ ANY WEIGHT

To schedule free Package Pickup,
scan the QR code.



USPS.COM/PICKUP

## TRACKED ■ INSURED



PS00001000014

EP14F October 2023
OD: 12 1/2 x 9 1/2

PAPER
POUCH

This package is made from post-consumer waste. Please recycle - again.

---

## UNITED STATES POSTAL SERVICE®   Click-N-Ship®

usps.com
$8.75
US POSTAGE

U.S. POSTAGE PAID

9405 5301 0935 5113 1080 03 0087 5001 0008 5003



03/06/2025    Mailed from 85031   25403159760 9832

### PRIORITY MAIL®

CHAUNCEY HOLLINGBERRY
3810 N MARYVALE PKWY APT 1094
PHOENIX AZ 85031-3023

03/10/2025
Flat Rate Envelope
RDC 03

C011

CLERK OF THE COURT SANDRA DAY O'CONN
401 W WASHINGTON ST SPC 1 STE 130
PHOENIX AZ 85003-2117

### USPS TRACKING #

9405 5301 0935 5113 1080 03



This packaging is the property of the U.S. Postal Service® and is provided solely for use in sending Priority Mail® and Priority Mail International® shipments.